UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BRIGETTE  MCKNIGHT-CAMERON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:13-cv-01774-RLY-DKL |
| | ) | |
| BOSTON MUTUAL LIFE INSURANCE | ) | |
| COMPANY and FIREFIGHTERS | ) | |
| CREDIT UNION DISABILITY PLAN, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff, Brigette McKnight-Cameron, is the former Vice President of Lending for

Firefighters Credit Union League ("FCU"), and, in that capacity, was a participant in

Firefighters Credit Union Disability Plan.  In her Amended Complaint, Plaintiff alleges

that Defendants, Boston Mutual Life Insurance Company and Firefighters Credit Union

Disability Plan, arbitrarily and capriciously terminated her long-term disability benefits,

and seeks to recover them pursuant to 29 U.S.C. § 1132(a)(1)(B) of the Employee

Retirement Income Security Act ("ERISA").  Both parties now move for summary

judgment.  For the reasons set forth below, the court **GRANTS** Plaintiff's Motion for

Summary Judgment and **DENIES** Defendants' Motion for Summary Judgment.

I.      **Factual Background**

        A.      **The Parties and the Long-Term Disability Plan**

1

The FCU Plan is insured by Boston Mutual and all claims are administered by Disability Reinsurance Management Services, Inc. ("Disability RMS"). The Plan provides protection for eligible participants by paying a portion of their income should they become disabled. The Plan defines disability as follows:

> Disability means that due to sickness or injury:
>
> · you are not able to perform some or all of the material and substantial duties of your regular occupation and you have at least a 20% loss in your pre-disability earnings.  OR
>
> · while you are not able to perform some or all of the material and substantial duties of your regular occupation, you are working in any occupation and have at least a 20% loss in your pre-disability earnings.
>
> We will continue payments to you beyond 24 months if due to the same sickness or injury:
>
> · you are not able to perform the material and substantial duties of any gainful occupation.  OR
>
> · while you are not able to perform some or all of the material and substantial duties of your regular occupation, you are working in any occupation and have at least a 20% loss in your pre-disability earnings.
>
> Material and substantial duties are the duties that:
>
> · are normally required for the performance of the occupation; AND
>
> · cannot reasonably be omitted or changed.

(R. at 18). Boston Mutual granted Disability RMS discretionary authority to make all benefit determinations, both as to eligibility and termination. (R. at 39).

Plaintiff began working for FCU in November 1992. In 1998, Plaintiff was diagnosed with scleroderma and Raynaud's syndrome due to hand pain. She remained

2

stable until approximately March 2009, when she began to experience extreme fatigue, decreased strength in her extremities, bilateral hand pain, and jaw pain.  Her health continued on a downward spiral, with additional pain reported in her joints, face, head, jaw, feet, hip, elbow, wrists, and shoulder, and gastrointestinal problems, including gastroesophageal reflux disease ("GERD"), nausea, vomiting, and constipation.  In an effort to address her symptoms, Plaintiff visited her treating physician, Dr. Mary Beth Hensley, on numerous occasions; she also saw a neurologist, a podiatrist, several rheumatologists, and an oral surgeon.  She was eventually diagnosed with a plethora of ailments, including, but not limited to, scleroderma[1] (or CREST[2] syndrome), fibromyalgia,[3] depression, insomnia, irritable bowel syndrome, temporomandibular joint

---

[1] Scleroderma is an autoimmune rheumatic disease that causes the skin to become thick and hard, a buildup of scar tissue, and damage to internal organs such as the heart and blood vessels, lungs, stomach, and kidneys.  The effects of scleroderma vary widely and range from minor to life-threatening, depending on how widespread the disease is and which part of the body are affected. There are two types of scleroderma: localized and systemic.  Localized scleroderma usually affects only the skin, but it can spread to the muscles, joints and bones.  Systemic scleroderma is a more serious form of the disease, as it affects the skin, muscles, joints, blood vessels, lungs, kidneys, heart and other organs.  There is no cure for this chronic disease.  American College of Rheumatology, *Scleroderma*, http://www.rheumatology.org/I-Am-A/Patient-Caregiver/Diseases-Conditions/Scleroderma.

[2] The acronym CREST stands for Calcinosis/Raynauds/Esophageal involvement/ Sclerodactyly/Telangiectasia.  (R. at 727).

[3] Fibromyalgia is a chronic health condition that causes pain all over the body and other symptoms such as: severe fatigue, sleep problems, memory problems or an inability to think clearly, tenderness to touch or pressure affecting muscles, and sometimes joints and skin.  In addition, fibromyalgia may also be associated with depression and anxiety, migraine or tension headaches, digestive problems (irritable bowel syndrome or gastroesophageal reflux disease), irritable or overactive bladder, pelvic pain, and temporomandibular disorder ("TMJ").  American College of Rheumatology, *Fibromyalgia*, http://www.rheumatology.org/I-Am-A/Patient-Caregiver/Diseases-Conditions/Fibromyalgia.

disorder ("TMJ"), and Raynaud's phenomenon.[4]  (*See e.g.*, R. at 761, 878, 923, 935, 948, 1026, 1193, 1303).

>    **B.**    **Disability Benefits for 24 Months and Social Security Disability Benefits**

On October 15, 2010, at the age of 44, Plaintiff submitted her initial claim for long-term disability benefits.  (R. at 1174-75).  Boston Mutual's consulting physician, Dr. Lawrence S. Broda, conducted a physician medical review of Plaintiff's file.  (R. at 826-837).  In his review, he considered medical records from Dr. Hensley (family practice), Dr. Veronica Mesquida (rheumatology), Dr. Naresh Chauhan (rheumatology), Dr. Stefan Monev (rheumatology), Dr. Michael Stack (rheumatology), Dr. Arthur Roberts (oral surgeon), Dr. Dawn Zapinski (neurology), Dr. Brian Elliott (podiatrist), Dr. Jill Beavins (family practice), and Dr. James Pease (family practice).  (R. at 828).  On April 6, 2011, Dr. Broda submitted a report, concluding that, on balance, Plaintiff's functional ability appeared to be impaired due to "chronic pain, fatigue that is at least in part due to narcotics/gabapentin therapy for pain, and possible scleroderma."  (R. at 836).  He noted that the duration of her impairment, "due to generalized/joint pain, fatigue, medications, and possible scleroderma is uncertain and requires additional information."  (*Id*.).

In a letter dated April 8, 2011, Disability RMS notified Plaintiff she was approved for benefits with an effective date of November 14, 2010, for a period of twenty-four

---

[4] Raynaud's phenomenon often occurs when blood flow to the hands, fingers, and toes is temporarily reduced most often after exposure to cold temperatures.  American College of Rheumatology, *Raynaud's Phenomenon*, http://www.rheumatology.org/I-Am-A/Patient-Caregiver/Diseases-Conditions/Raynauds-Phenomenon.

months.  The letter informed her that to be eligible to receive disability benefits after November 14, 2012, she must be found "unable to perform any occupation for which [she] [is] qualified by [her] education, training, or experience."  (R. at 821-22).  In addition, the letter expressly stated that her benefits claim "will be evaluated on an ongoing basis to determine whether you remain eligible to receive" Policy benefits.  (R. at 822).

On November 19, 2010, Plaintiff applied for Social Security Disability Income ("SSDI") benefits.  (R. at 1029).  A medical review performed by Dr. A. Dobson, a physician hired by the Social Security Administration, found Plaintiff met listing 14.04(D) because "review of evidence shows Systemic scleroderma with severe fatigue, malaise, involuntary weight loss & limited ability to maintain mental/physical concentration, persistence & pace."  (R. at 1027).

On January 15, 2011, less than two months after she applied for SSDI, Plaintiff was found to be disabled by the Social Security Administration and was awarded SSDI without a hearing.  (R. at 1056).

### C.    Supplemental Review

Upon the request of Disability RMS, Dr. Broda conducted a supplemental review of Plaintiff's claim, dated November 23, 2011.  (R. at 723-30).  Dr. Broda considered additional medical records from the ten doctors listed above, and from two additional doctors: Dr. Judith Dunipace (anesthesiology/pain management) and Dr. Steven Neucks (rheumatology).  (R. at 725).  He concluded:

> The claimant likely has limited scleroderma or CREST syndrome, FM [fibromyalgia], possible Ehlers/Danlos syndrome,[5] depression, and possible medication side effects with chronic pain and fatigue.  The claimant consistently reports pain and fatigue and has the support of her current providers that she is unable to work.  However, exams, imagining studies, and lab tests including inflammatory markers do not support findings consistent with impairment.  In my opinion, additional information needed to assess level of functional capacity and whether impairment supported.

He also concluded that Plaintiff's current restrictions – no repetitive bending, twisting, kneeling, stooping, pushing, or pulling motions, and no prolonged periods of sitting or standing – were "overly restrictive and medically unsupported."  (R. at 729).  As a result, Dr. Broda concluded that additional information was needed to assess Plaintiff's ability to work, and he recommended that Disability RMS obtain a functional capacity evaluation "with consideration of concurrent observational data."  (*Id*.).

### D.  Independent Medical Evaluation

Disability RMS asked Dr. Eric Jay Levine, board certified in occupational medicine, to conduct an independent medical examination ("IME") of Plaintiff.  (R. at 663-682).  On September 11, 2012, Dr. Levine examined Plaintiff in person and reviewed her medical history.  (*Id*.).  With respect to activities of daily living, Plaintiff reported (1) she can walk to her mailbox (essentially one short block) "on a very good day," but when she goes to the zoo, she must use a wheelchair; (2) she has "weak pinch grip, particularly with her right hand" and must hold files by resting them on top of her supinated hand; (3)

---

[5] Ehlers-Danlos syndrome is a group of inherited disorders that affect your connective tissues – primarily your skin, joints and blood vessel walls.  Mayo Clinic, *Ehlers-Danlos Syndrome*, www.mayoclinic.com/diseases-conditions/ehlers-danlos-syndrom/basics/definition/con-20033656.

she has "problems with pain reaching overhead"; (4) she can sit for only one hour with a change in position needed every five minutes or so; (5) she cannot shop for groceries; and (6) she has difficulty eating and swallowing. She also complained of a stiff neck. (R. at 665-66). On page sixteen of his report, he discussed Plaintiff's "Problem List," which included (1) chronic pain, (2) connective tissue disease including possibly lupus, rheumatoid arthritis, scleroderma, and Ehlers-Danlos syndrome with hyper-flexible joints, and (3) fatigue. (R. at 678). Other diagnoses of relevance were found to be GERD and depression. (*Id.*). He concluded that both Plaintiff's chronic pain and fatigue could possibly be "multifactorial," but that it was not clear how Plaintiff's diagnoses of connective tissue disease were determined. (*Id.*). Ultimately, however, he found Plaintiff was limited to working "3 hours per day 5 days a week," with Plaintiff freely alternating between sitting and standing. (*Id.* at 679). He also found, in relevant part:

> Walking is limited to about 1 minute per hour over a 3-hour workday. Standing is limited to 1 or 2 minutes per 15 minutes, predominantly to allow her to stretch as needed. The claimant is limited to reaching between hip and should to [sic] occasionally with either hand. Never allowed to reach above her head. She can rarely reach between head and shoulder level with either hand. Bending and twisting of her back is limited to rarely, less than 10%. Fine manipulation and fingering is limited to occasionally with either hand.

(*Id.*).

### E.   Surveillance Video and the Termination of Plaintiff's benefits

Disability RMS hired G4S Compliance & Investigations to follow Plaintiff and conduct surveillance over the three day period of September 10-12, 2012 – ironically, during her scheduled appointment with Dr. Levine. (R. at 633-39). On September 10, surveillance was conducted for an eight hour period. During that time, Plaintiff is shown

getting out of a car at 1:46 p.m. carrying what appears to be papers and a file or book in her left arm and soda in her left hand, and a purse and another bag hanging on her right forearm, and enters her house. (R. at 649).

On September 11, surveillance was conducted for over eight hours. At 9:36 a.m., Plaintiff is seen walking to her mailbox carrying a tote bag in her right hand, books on her left arm, and a purse on her left shoulder. (R. at 650). She places the tote bag on the ground, and places mail in the mailbox with her right hand. Plaintiff then gets into the passenger seat of an SUV with her purse, books and papers, where she is driven by her mother to her scheduled IME with Dr. Levine. At 10:00 a.m., she exits the vehicle with a black bag over her left shoulder and papers in her right forearm. She is next seen walking slowly "pigeon-toed" toward the entrance of the building. (R. at 651).

At 1:21 p.m., Plaintiff and her mother exited the building. Plaintiff walked slowly with her purse on her left shoulder and a folder and papers in her left arm toward the vehicle. They proceed to Panera Bread, where they have lunch for approximately forty-five minutes. (R. at 652). The investigator reported that Plaintiff carried two food trays to a table (*id.*); that sequence of events, however, was not part of the video footage nor pictures submitted with the investigator's report. After lunch, she walked with a slight limp to the vehicle, and the two arrive at Bed, Bath & Beyond close to 3:00 p.m. The footage in the store is short and difficult to discern. Defendants maintain Plaintiff was seen pushing a shopping cart; the footage observed by the court shows her to be leaning on the cart with her forearms as it moves forward about eight feet. She walks out of the store with a slight limp and with a bag in her right hand, but before she enters the vehicle,

8

she places the bag into her left hand.  Her mother drives her home.  She is last seen emerging from the vehicle slowly with a tote bag, shopping bag, and purse hanging from her right forearm.  She walks to her front door with a slight limp.  (*Id*.).

On September 12, surveillance was conducted for an eight-hour period.  The only footage occurs around 1:00 p.m., when Plaintiff is seen cutting roses from her rose bush for four minutes while talking on her cell phone.  (R. at 654).

Dr. Broda viewed the surveillance and submitted a supplemental report stating, "The reported restrictions and limitations provided by the IME and the observed activities do not correlate well.  The claimant observed to do more than the provided restrictions and limitations."  (R. at 624).  Dr. Broda concluded that more information was needed to assess Plaintiff's impairments, and he recommended that the surveillance video be sent to Dr. Levine for further comment and that a vocational analysis be conducted.  (*Id*.).

After viewing the surveillance video and the investigator's written report, Dr. Levine issued a revised IME dated November 4, 2012.  He found Plaintiff's observed activities in the surveillance video "significantly outperformed her stated self-reported activities and capabilities, as well as her performance during her IME examination which [he] conducted on 9/11/2012."  (R. at 661).  He therefore concluded that Plaintiff can work "8 hours per day 5 days a week and 40 hours per week," and that she can "sit for 8 hours per day, freely allowing her to alternate between sitting and standing positions to stretch as she desires," and walk and stand "10 minutes at one time."  (R. at 660).  Dr. Broda reviewed Dr. Levine's supplemental report, and agreed that Plaintiff could work on a full-time basis.  (R. at 589).

Dr. Broda suggested Plaintiff's claim be sent to a vocational resource analyst to determine if Plaintiff could perform occupational duties consistent with Dr. Levine's revised restrictions and limitations.  (R. at 589).  Disability RMS did so, and on November 7, 2012, vocational rehabilitation counselor Nancy Gilpatrick concluded that Plaintiff's previous employment was a sedentary occupation, and based on Dr. Levine's revised IME report, concluded:

> The work performed by [Plaintiff] in her own occupation meets the definition of sedentary work as defined.  The restrictions stated do not conflict with the physical demands of [Plaintiff's] occupation.

(R. at 591).

In a letter dated November 9, 2012, Disability RMS notified Plaintiff that it was terminating her long-term disability benefits.  (R. at 585-86).  Disability RMS also referenced Plaintiff's SSA award, but stated, "This does not change the above opinions." (R. at 586).

## F.      Plaintiff's First Appeal

On November 21, 2012, Plaintiff filed her first appeal *pro se*.  (R. at 572-74).  She later hired a lawyer, withdrew the appeal, and then refiled it on May 9, 2013.  (R. at 521-23).  Included in her appeal are letters from Dr. Hensley and Dr. Neucks.  Dr. Hensley disputed Disability RMS' determination that Plaintiff could work, and heavily criticized its reliance on the surveillance video.  (R. at 575).  She noted, among other things, that Plaintiff has "chronic pain and chronic fatigue from her autoimmune disorder" and "is on a LARGE amount of pain medications in order to accomplish even simple errands."

(*Id.*).  Similarly, Dr. Neucks found "nothing in the surveillance tapes that dissuades me from my prior communications."  (R. at 500).  He explained:

> The patient has CREST syndrome and has difficulty with her hands.  She is going to function better for short periods of time and during warm spells then [sic] she will in the cold or with repetitive activities.  I do not think that eating in a restaurant or clipping flowers for five minutes constitutes anything near a 40-hour workweek with repetitive use of computers and a variety of other instruments.

(*Id.*).

Disability RMS hired Dr. Julia Ash, board certified in rheumatology, to consider Plaintiff's appeal.  (R. at 342-48).  After considering Plaintiff's medical records and the letters from her physicians, she determined that "[l]imited scleroderma is the only impairing condition."  (R. at 347).  She therefore restricted Plaintiff from working outside during the winter months, and cautioned her to avoid hand contact with cold objects due to Raynaud's phenomenon.  Dr. Ash also limited Plaintiff to "[o]ccasional walking standing and climbing stairs," "[o]ccasional lifting and carrying up to 10 pounds," and occasional "pushing and pulling up to 50 pounds."  (R. at 348).

On July 16, 2013, Disability RMS notified Plaintiff that her appeal was denied. (R. at 309-12).

### G.      Plaintiff's Second Appeal

On September 12, 2013, Plaintiff filed a second appeal of the denial of her disability benefits.  (R. at 208-95).  Plaintiff filed additional medical records with her appeal, including a report from Dr. Soumya Chatterjee, a physician in the Cleveland Clinic's Department of Rheumatology and Immunologic Diseases.  (R. at 214-17).  Dr.

Chatterjee's testing showed a positive Antinuclear antibody (ANA) and centromere antibody consistent with limited scleroderma, but no "definitive laboratory evidence of any other autoimmune rheumatologic disorder including rheumatoid arthritis or systemic lupus erythematosus." (R. at 214). Dr. Chatterjee noted clinical evidence of Sjogren's syndrome[6] and confirmed Plaintiff's diagnosis of fibromyalgia. (R. at 216-17).

Dr. Ash reviewed the medical file for purposes of Plaintiff's second appeal. After reviewing Plaintiff's file, Dr. Ash opined that the entire file, including the newly-submitted information, supported her previous conclusion that Plaintiff was able to work full-time with certain restrictions. (R. at 189). She found Plaintiff's diagnoses of TMJ, distal esophagitis, constipation and irritable bowel syndrome did not support significant medical impairments and that Plaintiff's diagnosis of migraine headaches was not well-documented and therefore, did not provide enough information to support a functional impairment. (R. at 186). She also found the medical records did not consistently document Plaintiff's claimed difficulties in, for example, using the stairs, exercising, kneeling, entering and exiting an automobile, walking, and putting on shoes, and that Plaintiff's complaints of pain and of an inability to perform "basic activities of daily living are not consistent and seem to be out of proportion to documented physical findings." (R. at 188). As additional support for her opinion, she noted the "video surveillance documents the claimant driving, walking, eating at a restaurant, cutting

---

[6] Sjogren's syndrome is a disorder of the immune system identified by dry eyes and dry mouth. It often accompanies other immune system disorders, such as rheumatoid arthritis and lupus. Mayo Clinic, *Sjogren's Syndrome*, www.mayoclinic.org/diseases-conditions/sjogrens-syndrome/basics/definition/con-20020275.

flowers, and carrying bags without difficulty."  (R. at 185).  Dr. Ash also discounted the

opioid pain medications (fentanyl and Percocet) Plaintiff was prescribed.  She speculated

that these medications "are taken on an as needed basis" and that "[n]one of the medical

conditions listed in the medical record support use of one or a combination of these two

opioid analgesics."  (R. at 187).

On November 1, 2013, Disability RMS denied Plaintiff's second appeal.  (R. at

161-67).

## II.     Standard of Review

The parties agree that it is appropriate for the court to review the Defendants'

decision under the arbitrary and capricious standard of review because the Plan

documents delegate discretionary authority to the plan administrator, Disability RMS, to

determine eligibility for benefits.  Review under this standard "is not a rubber stamp,"

and "turns on whether the plan administrator communicated 'specific reasons' for its

determination to the claimant, whether the plan administrator afforded the claimant 'an

opportunity for full and fair review,' and 'whether there is an absence of reasoning to

support the plan administrator's determination.'"  *Majeski v. Metro. Life Ins. Co.*, 590

F.3d 478, 484 (7th Cir. 2009) (quoting *Leger v. Tribune Co. Long Term Disability Benefit

Plan*, 557 F.3d 823, 832-33 (7th Cir. 2009)).  The Seventh Circuit stated the standard

should be applied "in ways that include focus on procedural regularity, substantive merit,

and faithful execution of fiduciary duties."  *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d

758, 766 n.5 (7th Cir. 2010).

### III.   Discussion

Plaintiff argues Disability RMS' initial termination of her long-term disability benefits was arbitrary and capricious and that its denial of her two appeals was an abuse of discretion.

### A.   Initial Termination Decision

Plaintiff argues Disability RMS' decision to terminate her benefits was arbitrary because: (1) it wholly failed to consider the SSA's disability finding and (2) its reliance on the surveillance video does not provide substantial evidence that Plaintiff could work in her occupation as the Vice President of Lending on a full time basis.

### 1.   Social Security Determination

The Boston Mutual Policy "required[7]" (or at least strongly encouraged) Plaintiff to apply for Social Security Disability Income benefits.  Plaintiff therefore filed for the same on November 19, 2010.  Less than two months later, the SSA found Plaintiff was completely disabled and awarded her disability benefits without a hearing.

---

[7] Defendants dispute this assertion.  However, the Policy provides that Boston Mutual can "estimate the amount of benefits you may be eligible to receive" under the Social Security Act, and it "can reduce [the] monthly payment to you by this estimated amount if you: have not been awarded such benefits but have not been denied such benefits; OR have been denied such benefits and the denial is being appealed; OR are reapplying for such benefits."  (R. at 33).  Thus, had Plaintiff not applied for SSDI benefits, the Policy reserved Boston Mutual's right to reduce her monthly disability payment by an "estimated" SSDI amount calculated (apparently) by Boston Mutual.  The Policy even includes a section entitled "Social Security Assistance," in which Boston Mutual offers to assist a claimant in obtaining Social Security disability benefits by helping him or her find "appropriate legal representation" and obtain medical and vocation evidence.  (R. at 45).  It even offers to "reimburse[e] pre-approved case management expenses." (*Id*.).

Disability RMS had a copy of Plaintiff's SSA Award letter in its file at the time it reviewed Plaintiff's claim for disability benefits.  In the letter notifying her that she failed to meet the Policy's definition of "disability," it stated, "We understand you are receiving benefits from the Social Security Administration.  This does not change the above opinions."  (R. at 577).

In order to provide a full and fair review, the Seventh Circuit "unambiguously requires a plan administrator to 'address any reliable, contrary evidence presented by the claimant.'"  *Majeski*, 590 F.3d at 484 (quoting *Love v. Nat'l City Corp. Welfare Benefit Plan*, 574 F.3d 392, 397-98 (7th Cir. 2009)).  Though a plan administrator is not "forever bound" by a Social Security determination of disability, its "failure to consider the determination in making its own benefit decisions suggests arbitrary decisionmaking." *Holmstrom*, 615 F.3d at 773; *Holzmeyer v. Walgreen Income Prot. Plan for Pharmacists & Registered Nurses*, 44 F. Supp. 3d 821, 845 (S.D. Ind. 2014).

The parties disagree over whether Disability RMS sufficiently considered the Plaintiff's SSA award.  Disability RMS maintains that it did, as evidenced by the fact that the SSA's documents appear in the claim file and that it did mention the award in its denial letter.  According to Disability RMS, case law holds that an administrator fails to adequately explain the reasons for its denial when it *wholly fails* to address a favorable SSA award.  *Raybourne v. Cigna Life Ins. Co. of New York*, 700 F.3d 1076, 1087 (7th Cir. 2012) (administrator failed to mention favorable SSA award); *Holmstrom*, 615 F.3d at 773 (administrator failed to consider favorable SSA award); *Holzmeyer*, 44 F.Supp.3d at 845 (administrator failed "to address the SSA award *at all*") (emphasis in original);

15

*Demaree v. Life Ins. Co. of N. Am.*, 789 F. Supp. 2d 1002, 1014 (S.D. Ind. 2011) (no evidence administrator considered SSA's disability determination). Here, Disability RMS argues, its one-sentence reference to Plaintiff's SSA award was sufficient to establish that it did consider the award and the evidence that underlay it, but was not persuaded by them. Plaintiff argues Disability RMS must do more than that; it must explain why it did not find the SSA's determination persuasive, and it failed to do so.

The resolution of this issue requires a brief discussion of both *Holmstrom* and *Raybourne*. In *Holmstrom*, the SSA found plaintiff to be completely disabled and awarded disability benefits. 615 F.3d at 763. The SSA's definition of disability was more stringent than the plan's standard for "any occupation" disability definition. *Id.* at 763 n. 4. In addition, the plan administrator insisted that the plaintiff apply for Social Security disability benefits so as to reduce the amount of benefit due under the plan, but then failed to consider the SSA award in its decision to terminate plaintiff's benefits under the plan. *Id.* at 772. The Court found the "administrator's failure to consider the [SSA] determination in making its own benefits decisions suggests arbitrary decisionmaking" especially where, as here, "the Social Security determination was made under a similar or more stringent disability determination." *Id.* at 773.

In *Raybourne*, the SSA found plaintiff to be completely disabled and awarded him benefits. 700 F.3d at 1078. The definition of disabled under the plan was found to be the functional equivalent of the definition under the SSA. *Id.* at 1086. As in *Holmstrom*, the amount of benefit the plaintiff would receive was reduced by an award by the SSA. In fact, the plan hired consultants to assist the plaintiff in pursuing his claim with the SSA

16

and recouped benefits it paid after the plaintiff received a favorable determination from the SSA. *Id*. at 1084. Notwithstanding the SSA award, the administrator denied future benefits under the plan. *Id*. at 1084-85. With these facts, and considering the conflict of interest created by the fact that the insurer/administrator had a financial interest in denying benefits, the Court concluded the denial was arbitrary and capricious. *Id*. at 1088. The Court stated, "As we noted in *Holmstrom*, a plan administrator may not simply ignore this evidence [the SSA award and the ALJ's analysis] but must address it and provide a reasonable explanation for discounting it, especially when the administrator operates under a structural conflict of interest." *Id*. at 1087.

Nothing in the cases cited by the Defendants holds that only the failure to mention a plaintiff's SSA award is arbitrary and capricious. That happened to be a salient fact in those cases. What is important, and what Defendants fail to acknowledge, is that, like *Holmstrom*, the Plan's standard for disability[8] is less exacting than the definition of "disability" for social security purposes. Thus, a "full and fair" review of Plaintiff's claim required Disability RMS to address Plaintiff's SSA award and provide a reasoned explanation for discounting it. In addition, like the plans in *Holmstrom* and *Raybourne*, the Plan arguably required Plaintiff to apply for SSDI benefits because, as a practical matter, had she not applied and she was awarded long-term disability benefits under the

---

[8] Disability under the SSA is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" which persists for at least one year or which can be expected to lead to death. 42 U.S.C. § 423(d)(1)(A). By contrast, the Plan's "own occupation" definition of disability is, in relevant part: "you are not able to perform some or all of the material and substantial duties of your regular occupation and you have at least a 20% loss in your pre-disability earnings." (R. at 18).

Plan, the Plan reserved the right to estimate an SSA award and deduct it from her

disability check.  Defendants stood to gain from such an award.

In the letter denying long-term disability benefits, Disability RMS briefly

discusses only the surveillance video, Dr. Levine's supplemental opinion, and the

Vocational Consultant's opinion.  (R. at 586).  It makes no comment regarding the

reasons the SSA advanced in support of its finding that Plaintiff was disabled -- i.e.,

systemic scleroderma, severe fatigue, malaise, difficulty concentrating, etc.  While an

ERISA plan administrator is not required to discuss each item of evidence in an adverse

benefit determination, *Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir. 1996),

Disability RMS' failure to adequately discuss its reasons for discounting the SSA

disability determination is a factor indicating that its decision to terminate Plaintiff's

benefits was arbitrary and capricious.  *Raybourne*, 700 F.3d at 1087.

### 2.     The Surveillance Video

Plaintiff next contends the surveillance video did not provide Disability RMS with

substantial evidence to terminate Plaintiff's disability benefits.  To give context to the

timing of the video surveillance, Plaintiff was approved for disability for her "own

occupation" on April 8, 2011, retroactive to November 14, 2010.  To continue to qualify

for benefits past November 14, 2012, Plaintiff had to satisfy the Plan's definition of

disabled under the "any occupation" prong.  On September 11, 2012, Plaintiff underwent

an IME with Dr. Levine.  After reading Plaintiff's medical records and conducting a

physical examination, Dr. Levine determined that Plaintiff could only work "3 hours per

day 5 days a week" with certain limitations related to her ability to walk, sit, stand, bend, twist, etc. (R. at 679).

G4S Compliance & Investigations conducted surveillance on Plaintiff from September 10-12, 2012 – in fact, in one scene from September 11, Plaintiff is seen walking into Dr. Levine's office.  The surveillance video prompted Disability RMS to request a supplemental report from Dr. Levine.  In his Supplemental Report dated November 4, 2012, he revised his opinion regarding Plaintiff's work capacity because, in his opinion, "[t]he claimant's observed activities on the above mentioned surveillance videos significantly outperformed her stated self-reported activities and capacity, as well as her performance during her IME examination."  (R. at 660-61).  In short, he determined that Plaintiff could work "8 hours per day 5 days a week and 40 hours per week" with minor limitations.  (R. at 660).

On November 9, 2012 – just five days before her "own occupation" disability benefits were to end – Disability RMS determined that Plaintiff could work her "own occupation" "8 hours per day 5 days a week."  (R. at 586).  The termination letter stated, "Although the testing conclusion for the [independent medical] examination suggested restrictions and limitations, Dr. Levine's conclusion was that your observed activities significantly outperformed your stated self-reported activities and capabilities as well as your performance on the examination."  (*Id*.).  These observed activities included footage showing: (1) Plaintiff "driving, walking and carrying items with no assistive devices" on September 10; (2) Plaintiff "entering and exiting a vehicle and building with no assistance, walking, carrying items, pushing a shopping cart, ordering and eating food in

19

a restaurant and carrying bags" on September 11; and (3) Plaintiff "walking and cutting flowers with [her] neck tilted so [she] could hold a telephone to [her] ear." (*Id.*).

The Sixth Circuit addressed a similar set of circumstances in *Hunter v. Life Ins. Co. of N. Am.*, 437 F. App'x 372, 378-79 (6th Cir. 2011). There, the plaintiff suffered from, *inter alia*, chronic pain, rheumatoid arthritis, osteoarthritis, and fibromyalgia. *Id.* at 373. Like the Plaintiff, she was granted disability benefits under the plan's "own occupation" definition of disability. *Id.* The claims administrator hired a private investigator to surveil plaintiff and document her functional capacity on two separate occasions. *Id.* at 374. Between September 12 and September 15, 2007, plaintiff was captured on video carrying groceries from the trunk of her vehicle to her house, and between January 8 and 9, 2008, plaintiff was captured driving to and from a medical office, pumping gasoline, and test driving a vehicle. *Id.* In rejecting the video surveillance, the Sixth Circuit noted that the plaintiff "never disputed her ability to occasionally sit, stand, walk, reach, or drive." *Id.* at 379. Consistent with the unrebutted opinions of plaintiff's treating physicians, the Sixth Circuit found that those activities did not indicate she could perform all of the duties of her former occupation. *Id.*

Also worthy of note is *Gessling v. Group Long Term Disability Plan for Employees of Sprint/United Mgmt. Co.*, 693 F. Supp. 2d 856 (S.D. Ind. 2011). There, the plaintiff worked for Sprint as an account executive. *Id.* at 859. As a result of a vehicular accident, he suffered neck and spine injuries. *Id.* Like Disability RMS, the claims administrator hired private investigators to observe plaintiff over the course of four days. *Id.* at 860. The video surveillance showed the plaintiff engaged in minimal movement,

which included the plaintiff walking to and from his vehicle, bending over once, running a few errands, and gently wiping part of his car dry after an automated car wash. *Id*. at 863. This court found those observations did not provide objective support for the administrator's decision to terminate benefits, because those observations "were not inconsistent with [plaintiff's] alleged limitations." *Id*.

While the video surveillance in this case reveals some discrepancies between Plaintiff's stated and observed functionality, the inconsistencies are relatively minor, and do not indicate that Plaintiff can perform all the physical duties of her former occupation. Indeed, in all of the twenty-four or so hours of surveillance, there is not that much activity. On September 10, the video of Plaintiff lasts approximately one minute; on September 12, the video of Plaintiff lasts approximately four minutes; and on September 11, over the course of approximately six hours, the video of Plaintiff shows her being driven to Dr. Levine's office, eating lunch with her mother, and going to Bed Bath & Beyond.

Disability RMS makes much of the fact that Plaintiff pushed a shopping cart, walked without the need for any assistive device, carried bags, and cut flowers. Like the plaintiffs in *Hunter* and *Gessling*, Plaintiff never disputed her ability to occasionally sit, walk, reach, push, eat, and move her neck. Her claim was that she was *limited* in performing these activities.

Moreover, Defendants' characterization of Plaintiff's activities is somewhat exaggerated. For example, the footage from Bed Bath & Beyond does not show Plaintiff pushing a shopping cart; it shows Plaintiff leaning on a shopping cart with her forearms

on the handle walking slowly down part of an aisle before she stops to look at an item on a shelf.  In addition, Plaintiff did walk short distances without the assistance of a cane or wheelchair, but that is not inconsistent with her representation to Dr. Levine.  According to his IME report, she stated she needed a wheelchair when she goes to places like the zoo, where one can expect to walk and stand on uneven terrain for hours at a time.  In addition, Plaintiff is seen grasping a bag in her right hand on two occasions – when she gets her mail and when she exits Bed Bath & Beyond – and grasping mail to insert in her mailbox.  The footage of her holding a tote bag as she gets her mail is less than a minute, and the footage of her exiting Bed Bath & Beyond holding a bag and placing mail in her mailbox is even shorter.  And while Plaintiff did cut flowers with her arm above shoulder height while simultaneously cradling her cell phone with her shoulder, that event lasted approximately four minutes and is the only observed activity for that day.   The court finds the minimal activity shown in the surveillance video did not constitute substantial evidence establishing that Plaintiff was able to perform the material duties of her previous occupation.

Disability RMS' perfunctory termination of Plaintiff's disability benefits based solely on Dr. Levine's IME and the surveillance video was an abuse of discretion.

## B.     Plaintiff's First Appeal

Plaintiff contends that in her two appeals, Disability RMS discounted her considerable evidence of chronic pain and fatigue and failed to consider the opinions of her treating physicians.

### 1.     Chronic Pain and Fatigue

Plaintiff's complaints of pain and fatigue are well-documented.  (*See e.g.*, R. at 277, 450, 764, 778, 800, 803, 905, 937, 950, 1024, 1027, 1148, 1182, 1190, 1198, 1285, 1299).  The record reflects that Plaintiff has consistently been on narcotic prescription pain medications since at least June 2009.  (R. at 763, 978, 1198).  Yet, on June 6, 2013, when Dr. Ash reviewed Plaintiff's medical records and issued her report for purposes of Plaintiff's first appeal, she did not mention her pain once.  (R. at 342-48).  She stated only that the "record supports diagnosis of limited scleroderma of mild severity" and that her "[n]onspecific fatigue may stem from the diagnosis of limited scleroderma and sleep apnea."[9]  (R. at 346).  She also stated that the video surveillance showed Plaintiff "walking without limping and without assistive device, . . . entering and exiting vehicle, a building, pushing a shopping cart in a store, eating in a restaurant and carrying bags. . . [and] cutting flowers."  (R. at 345).  Disability RMS relied on Dr. Ash's medical file review in denying Plaintiff's first appeal.  (R. at 310-11).

"It is difficult, of course, for anyone but the subject to determine the subject's level of pain because of the unavailability of objective medical tests for pain."  *Gessling*, 693 F. Supp. 2d at 864.  Where a plaintiff produces evidence of an underlying impairment, a plaintiff's complaints of subjective pain may not be ignored "merely because they are unsupported by objective evidence."  *Carradine v. Barnhart*, 360 F.3d

---

[9] In her second appeal, Plaintiff's sleep apnea was not considered because "there is no mention of this in the medical records during the time frame that [Plaintiff's] disability claim was denied [November 2012]."  (R. at 166).

751, 753 (7th Cir. 2004); *see also Hawkins v. First Union Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003).

Here, the record reflects that Plaintiff consistently sought treatment for the pain associated with her underlying impairments – fibromyalgia and scleroderma – since 2009 and 2010 respectively.  (*See e.g.*, R. at 923 (systemic scleroderma and fibromayalgia), 987 (fibromyalgia), 948 (limited scleroderma and severe fibromyalgia)).  Her repeated attempts for treatment support an inference that her pain, though hard to prove through objective medical testing, was disabling.  *Diaz v. Prudential Ins. Co.*, 499 F.3d 640, 646 (7th Cir. 2007).  Dr. Ash reviewed Plaintiff's medical records and the surveillance video, but did not account for Plaintiff's "long history of treatment" for pain.  *Id*.  "At the very least, a mere record review is not sufficient to provide a reasonable basis for discounting [the treating physician's and the plaintiff's] accounts of [her] pain and resulting limitations."  *Gessling*, 693 F.Supp.2d at 866; *see also Nickola v. CNA Grp. Life Assurance Co.*, No. 03 C 8559, 2005 U.S. Dist. LEXIS 16219, at *23 (N.D. Ill. Aug. 5, 2005) ("Precedent teaches that an administrator cannot fail to adequately address the potential impact of narcotic pain medication on a claimant's ability to hold a job.").

Moreover, Dr. Ash failed to address, or even mention, Plaintiff's fibromyalgia diagnosis.  The principal symptoms of this disease are "'pain all over,' *fatigue*, disturbed sleep, stiffness . . . [and] multiple tender spots."  *Hawkins*, 326 F.3d at 916 (emphasis added).  "An administrator's failure to address all relevant diagnoses in terminating a claimant's benefits is also a cause for concern that suggests the decision may have been arbitrary and capricious."  *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 853 (3d Cir. 2011);

*see also Gessling*, 693 F. Supp. 2d at 866 ("But after reviewing the records, the reviewing physicians failed to come to grips with the real problem, the whole person, and the history that corroborated his complaints of pain.").

### 2.    Plaintiff's Treating Physicians

Futhermore, Disability RMS failed to explain why it disregarded the opinions of Plaintiff's treating physicians, Dr. Hensley and Dr. Neucks, who, unlike Dr. Ash, examined and treated Plaintiff on numerous occasions and noted significant restrictions based on their clinical observations and treatment of Plaintiff.  (R. at 337, 498, 500, 733-34, 761-62, 796, 889-90, 937, 950, 1177).  In fact, the denial letter did not mention Dr. Hensley at all and mentioned Dr. Neucks only to say that he did not return Dr. Ash's two phone calls (one of which was made while Dr. Neucks was on vacation).  Yet, Plaintiff submitted additional medical records and letters from both doctors, and letters opining that the surveillance video did not establish that Plaintiff could perform the requirements of her previous occupation.  (R. at 491, 575).  Worthy of note is Dr. Hensley's letter:

> She has chronic pain and chronic fatigue from her autoimmune disorder.  She is allowed to participate in life around her good days and is allowed to take opportunities to enjoy the outdoors.  She is on a LARGE amount of pain medications in order to accomplish even simple errands.  Her memory and focus are affected by her medications and interfere with her ability to perform work as well.  There is no criteria for disability that says you have to be bed bound and miserable . . . .
>
> The report does not follow her into her home where she sleeps from exhaustion some days from noon through the next morning.  Other days she doesn't even get out of bed because of pain and weakness and migraine headache.  The report does not note that she would be expected to have good days and bad days with the average bad days outweighing the good.

(*Id.* at 575).

"While [Disability RMS] was not required to give any special deference to [her treating physicians'] opinions, it was also not allowed to 'arbitrarily refuse to credit a claimant's reliable evidence, including opinions of a treating physician.'" *Hannon v. Unum Life Ins. Co. of Am.*, 988 F. Supp. 2d 981, 990 (S.D. Ind. 2013) (quoting *Holmstrom*, 615 F.3d at 774-75). This is especially true where, as here, the doctors who actually examined and treated Plaintiff found her to be disabled, notwithstanding the surveillance video. *See Holmstrom*, 615 F.3d at 775 (noting that all doctors who examined plaintiff found her disabled; thus, "reliance on record-review doctors who selectively criticized this evidence is part of a larger pattern of arbitrary and capricious decision-making"). Even Dr. Levine found her to be disabled after a physical examination. He abruptly changed his opinion upon viewing the surveillance video. That opinion, however, was ill-founded. The fact that she is seen eating lunch, running errands, and cutting flowers does not support the conclusion that she can work full-time. Indeed, the ability to perform basic activities of daily living is vastly different from the ability to withstand and sustain full-time employment, even at the sedentary level. *Hannon*, 988 F. Supp. 2d at 991 (citing *Hawkins*, 326 F.3d at 918). Accordingly, the court finds Disability RMS abused its discretion in denying Plaintiff's first appeal.

### C.    Plaintiff's Second Appeal

As for Plaintiff's second appeal, Disability RMS again relied on the medical file review submitted by Dr. Ash. This time, Dr. Ash was asked to comment on Plaintiff's pain medications. (R. at 186). She stated, "From the medical record, it is not clear who is prescribing two opioid medications, fentanyl and Percocet, at what dose and for what

26

reason.  It is likely that these medications are taken on an as needed basis."  (R. at 187).

Her answer is not consistent with the medical record.  Dr. Hensley's treatment notes for

August 28, 2012, clearly state that prescriptions for Fentanyl and Percocet were renewed

that visit.  (R. at 398-99; *see also* R. at 274-75 (listing medications and dosages as of

February 18, 2013)).  Her medical review shows that she was in receipt of these treatment

notes.  (R. at 343 (showing documents reviewed to include office visit notes from Dr.

Hensley from June 30, 2008 through June 26, 2013)).  Further, the court discovered Dr.

Hensley's treatment note dated February 8, 2013, in which she notes that Plaintiff

"stopped taking Percocet [because] she was feeling bad and starting to have withdraws

[sic]."  (R. at 272).  As for whether her complaints of pain were consistent with the

medical evidence and prescribed medications, Dr. Ash dismissed Plaintiff's complaints of

pain by relying on Dr. Levine's IME dated September 11, 2012, and the surveillance

video which, in her opinion, was evidence that Plaintiff could perform the activities of

daily living.  (R. at 188).  And like her previous medical review, Dr. Ash wholly failed to

mention Plaintiff's diagnosis of fibromyalgia, wholly failed to respond to Plaintiff's

subjective reports of pain, and completely disregarded the opinions of Plaintiff's treating

physicians.  Dr. Ash's opinion is particularly troubling because there is no evidence that

Plaintiff's condition had improved between October 2010 to November 2012.  *See*

*Majeski*, 590 F.3d at 485 (noting that a plan administrator's initial grant of benefits and

later termination of benefits, without medical evidence showing the plaintiff's condition

had improved, is a factor to consider in determining whether administrator abused its

discretion); *Leger*, 557 F.3d at 832 (same); *Nickola*, 2005 U.S. Dist. LEXIS 16219, at

*25 ("[I]f an insurer has already admitted that someone is so incapacitated that they are entitled to long-term disability payments, one can reasonably view the failure to produce evidence of improvement as a suspicious failing if the insurer decides that LTD benefits are no longer warranted.").  The court need not discuss the review from Nurse Sperry regarding Plaintiff's sleep apnea and irritative bladder, as the evidence of Dr. Ash's record review is sufficient to find Disability RMS' decision to deny her second appeal was arbitrary and capricious.

### D.  Remedy

Plaintiff asks the court to award her benefits directly rather than remanding for further proceedings.  Generally, where the initial denial of benefits was the result of improper procedures, remand for further consideration is the appropriate remedy, but where the plaintiff was actually receiving benefits that were improperly terminated, as they were here, the more appropriate remedy is reinstatement of benefits that were being paid before the improper denial.  *Gessling*, 693 F.Supp.2d at 873 (citing *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 775-76 (7th Cir. 2003)).  "'The distinction focuses on what is required in each case to fully remedy the defective procedures given the status quo prior to the denial or termination.'"  *Id.* (quoting *Hackett*, 315 F.3d at 776)).  Here, because the status quo was the continuation of benefits, remedying the defective procedures requires a reinstatement of benefits.  *Id.*

## IV.  Conclusion

The court finds Disability RMS' decision to terminate Plaintiff's disability benefits was arbitrary and capricious.  Accordingly, Plaintiff's Motion for Summary

Judgment (Filing No. 32) is **GRANTED** and Defendants' Motion for Summary Judgment (Filing No. 40) is **DENIED**.  Plaintiff is entitled to retroactive payments of her benefits, with interest, for the remainder of the "own occupation" period, which the court understands to be four days.  The court remands the matter to the Plan and its administrator to determine whether Plaintiff was disabled from working in "any occupation" within the meaning of the policy after the "own occupation" period expired. **No later than October 13th**, the parties shall submit either one joint or two separate calculations of the principal and interest due as of October 14, 2015.  The court will then enter final judgment accordingly.


**SO ORDERED** this 30th day of September 2015.

 

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.